## COMMONWEALTH vs. DOEL CANDELARIO.

Essex. April 7, 2006. - June 5, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Homicide. Practice, Criminal,* Assistance of counsel. *Constitutional Law,* Assistance of counsel. *Mental Impairment.*

The judge in a murder case properly denied the criminal defendant's motion for a new trial based on ineffective assistance of counsel, where trial counsel's decision to forgo a defense of lack of criminal responsibility was an appropriate tactical decision, given the weakness of the defendant's own expert evidence, together with its likely demolition by the Commonwealth from cross-examination and rebuttal evidence [854-856], and defense counsel was not ineffective for failing to assert mental impairment to mitigate the charge of murder in the first degree, a defense that was unlikely to succeed [856-858]; moreover, the judge did not abuse his discretion in denying the motion for a new trial without an evidentiary hearing, where the motion and supporting materials did not make an adequate showing to warrant such a hearing [858-859].

A criminal defendant's one-sentence allegation concerning his denial of funds for an expert did not rise to the level of appellate argument. [859]

Where the defendant in a murder case was convicted in separate verdicts on two different theories and did not maintain that the evidence was insufficient on one of those theories, this court declined to consider whether the evidence was sufficient to submit the charge to the jury on the other theory. [859-860]

INDICTMENT found and returned in the Superior Court Department on November 1, 2000.

The case was tried before *Richard E. Welch III,* J., and a motion for a new trial, filed on June 20, 2005, was considered by him.

*Joseph A. Hanofee* for the defendant.

*Catherine Langevin Semel,* Assistant District Attorney, for the Commonwealth.

COWIN, J. The defendant was convicted by a jury of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty. He appeals from his conviction and

from the trial judge's denial of his motion for a new trial. Represented by new counsel on appeal, the defendant argues in his direct appeal that there was insufficient evidence for the jury to convict on the theory of extreme atrocity or cruelty. The ground for the defendant's appeal from the denial of his motion for a new trial is ineffective assistance of counsel for failure to pursue the defenses of lack of criminal responsibility and mental impairment. The defendant also claims that the judge abused his discretion by denying the motion for a new trial without an evidentiary hearing and declining to allow postconviction funds for a mental health expert. We affirm the conviction and the order denying the motion for a new trial. Pursuant to statutory directive, G. L. c. 278, § 33E, we have reviewed the entire record and decline to exercise our power to order a new trial or to direct the entry of a verdict of a lesser degree of guilt.

1. *Background.* a. *Trial.* We summarize the facts the jury could permissibly have found. The defendant and the victim, Maria Valle, had lived together for several years, most recently in Lawrence. Several weeks before the defendant shot and killed the victim, he moved out of their apartment, apparently at her request. Some time later, the defendant telephoned the victim's aunt, and said, "I am going to kill [the victim]," and "[I am] going crazy because [I] love[] her."

At approximately 6:30 P.M. on September 1, 2000, the defendant returned to his former residence. The victim was outside the home with several family members, including her aunt and an uncle. As the defendant approached, the aunt asked, "What's going on, son?" The defendant did not respond. The victim and the defendant conversed and the defendant walked to the house. He emerged about ten to fifteen minutes later with several large duffel-bag suitcases and asked the victim's uncle for a ride. As the car was not working, the uncle suggested that the defendant telephone for a taxicab.

The defendant called the victim over to speak with him on the street corner. According to the uncle, who was standing next to the defendant at that point, the defendant did not appear angry. Although the victim's aunt advised her not to go, the victim said, "I'll go because I'm fed up." The victim's uncle

heard her ask the defendant to "leave the area; never to come back." The defendant and the victim argued for approximately five to ten minutes. At one point, the defendant said that he "had to stay there." Then, the defendant pointed a gun at the victim, asked if she "doubt[ed] that he would dare to do it," and shot her. The victim's uncle tried to grab the defendant, but the defendant pointed the gun at him and said, "If you touch her, I'll kill you, too," then turned back and shot the victim a second time. The two shots were fired quickly, "[o]ne after the other." Both shots were to the victim's head. After the shooting, the defendant fled on foot. Other witnesses to these events were the victim's daughter and a man and woman in a vehicle stopped at a traffic light next to the shooting scene.

Shortly after the incident, the defendant telephoned Michael Pedroza, whom the defendant considered a "brother," and asked Pedroza to bring cigarettes to him at a nearby club. Pedroza was unable to locate the defendant at the club, but found him at a store. Pedroza drove the defendant to Haverhill. The defendant told Pedroza that he had gone to the victim's house to retrieve his clothing in response to her request, that they started arguing outside, and that he pulled out a gun from his waist and showed it to her. She was crying and said, "What are you going to do, kill me?" He "blanked out and shot her." He said that he no longer had the gun. On cross-examination, Pedroza stated that he was aware that the defendant had heroin with him and knew that the defendant was using drugs that night, but Pedroza was not asked whether the defendant had taken drugs before or after the shooting. Pedroza left the defendant in Haverhill after the defendant promised to go to the police the following Tuesday.[1]

Police arrested the defendant early the following morning in Lowell. They recovered a .25 caliber shell casing from the shooting scene, and two .25 caliber spent bullets were removed from the victim during the autopsy. Despite searching for the gun, the police were unable to locate it. The duffel bags the defendant had been carrying were searched pursuant to a warrant, but contained nothing of note.

b. *Mental health issues.* At arraignment defense counsel raised

---

[1]The murder occurred on the Friday of Labor Day weekend.

concerns about the defendant's competency, criminal responsibility, and mental impairment. Pursuant to G. L. c. 123, § 15 (*a*), the defendant was interviewed by a court psychologist. He was then sent to Bridgewater State Hospital for a competency evaluation. See G. L. c. 123, § 15 (*b*). In a report dated one month later, a Bridgewater psychiatrist, Daniel W. Comiskey, concluded that the defendant was competent to stand trial and that there was "no indication [of] . . . a mental disorder." The doctor noted that the defendant "appears to be attempting to present himself as [p]sychotic (a loss of contact with reality), but the symptoms he reports and displays are inconsistent, and do not support any psychiatric diagnosis." Dr. Comiskey also stated that the defendant "engaged in purposeless movements . . . and constantly stuttered throughout [the] interviews" except for the first fifteen minutes of one interview when the defendant did not have prior notice that the doctor would be speaking with him. The doctor stated that Bridgewater correction officers reported that the movement abnormalities and stuttering were apparent only when the defendant was with medical personnel. Dr. Comiskey also related the opinion of the defendant's treating psychiatrist at Bridgewater that the defendant was "neither psychotic nor depressed, and that his stuttering and repetitive movements [were] contrived."

Prior to trial, the defendant sought and received funds for a psychiatric evaluation. Approximately one year later, in late November, 2001, the defendant was returned to Bridgewater so that he could be "weaned" from an antipsychotic medication for purposes of his own expert's evaluation. (The reason that the defendant was taking the medication is unclear from the record.) When the defendant was discharged from Bridgewater one month later, Dr. Jamie Krauss, a Bridgewater psychologist, conducted a final competency evaluation and stated that, after his medication was stopped, the defendant reported increased symptoms, such as hallucinations. Dr. Krauss had concerns about the reliability of this self-report because it was inconsistent with the observations of other people. Dr. Krauss opined that it was "unclear" whether the defendant experienced "some real increase in symptoms or whether he is exaggerating/feigning

symptoms for secondary gain (i.e., for his court case; to stay at Bridgewater State Hospital)."

The defendant gave notice of an intent to "rely upon the defense of lack of criminal responsibility because of mental disease or defect and/or the defense of diminished capacity." The defense expert, Dr. Paul A. Spiers, who examined the defendant twice (once before and once after the weaning from antipsychotic medication) prepared a report of his examination, findings, and assessment of the defendant. He described the defendant as likely suffering from frontal lobe dysfunction, which is associated with decreased inhibition of inappropriate behavior. He also noted that a psychological test suggested a diagnosis of paranoid schizophrenia, although the defendant did "not present interpersonally" as a paranoid schizophrenic and had no "documented psychiatric history." Dr. Spiers stated that it was "not clear" from witness statements or police reports alone that the defendant was suffering from a disturbed thought process at the time of the shooting. Nevertheless, it was his opinion that the defendant "may have experienced a distortion of reality just prior to or at the time of killing the victim." He concluded that, due to evidence of his disturbed thought process and self-reports of drug and alcohol use, the defendant "most probably" lacked substantial capacity to conform his conduct to the requirements of the law at the time of the killing as a result of mental disease or defect.

In September, 2002, approximately one month before trial and more than three months after Dr. Spiers's report was issued, the defendant withdrew his intent to rely on a defense of lack of criminal responsibility. Trial counsel later explained in a letter to the defendant's appellate counsel that the mental illness defense was withdrawn after consultation with both the defendant and Dr. Spiers because of the perceived "weakness" of the doctor's opinion. (Although the notice and trial counsel's letter are couched in terms of withdrawal of the defense of lack of criminal responsibility only, appellate counsel's affidavit in support of his motion for a new trial refers to withdrawal of "the mental illness defenses" and "the decision to withdraw lack of criminal responsibility and mental impairment . . . defenses.")

c. *Defense at trial.* The defense trial strategy was to seek to reduce the crime from murder in the first degree to murder in the second degree by demonstrating the weakness of the evidence of premeditation and extreme atrocity or cruelty. Counsel sought to portray the defendant's mental state as such that he should not be convicted of murder in the first degree. He did so by eliciting evidence that the defendant did not appear angry when he arrived at the victim's residence, but became emotional while arguing with the victim, then fired his gun twice in quick succession and fled without his bags. Defense counsel established through Michael Pedroza that the defendant had heroin with him and was using drugs the night of the shooting. This theme was continued in closing argument. Defense counsel contended that there was insufficient evidence of premeditation and extreme atrocity or cruelty for a conviction of murder in the first degree.

Defense counsel sought jury instructions consistent with this strategy. He asked the judge to instruct on the effect of drug use on deliberate premeditation and extreme atrocity or cruelty. He also requested a manslaughter instruction. The judge refused these requests because there had been no evidence that the defendant had used drugs specifically before the murder and because the evidence of reasonable provocation was insufficient. Defense counsel also argued that there was insufficient evidence to submit the charge of murder in the first degree to the jury on the theory of extreme atrocity or cruelty. Although the judge stated that he was not aware of any case with precisely the same facts, he concluded that the evidence of two gunshots fired at the victim about five seconds apart was sufficient to support that theory.

The verdict slip contained separate entries for each of the two possible theories of murder in the first degree and the jurors were appropriately instructed in this regard. As stated, the jury convicted the defendant of murder in the first degree based on both deliberate premeditation and extreme atrocity or cruelty.

d. *Motion for a new trial.* After his trial and conviction, the defendant filed a motion for a new trial. The ground for the motion was that defense counsel developed a "viable mental illness/mental impairment defense in preparation for trial, but

. . . withdrew it on the eve of trial . . . and did not otherwise put on a defense except to cross examine the Commonwealth witnesses." In support of his motion, the defendant appended an affidavit of Dr. Spiers, the psychiatrist who had evaluated him before trial. In addition to reiterating his prior opinion, the doctor explained that the defendant's frontal lobe deficit, combined with his intoxication from alcohol and heroin purportedly at the time of the killing, "most probably" rendered him unable to premeditate or to "fully appreciate or comprehend the circumstances giving rise to the extremely cruel or atrocious nature of the killing" and caused him "probably [to] lack[] the ability to properly form intent and, potentially, to conform his conduct to the requirements of the law."

As stated, the judge denied the motion without an evidentiary hearing. In his findings, the judge recalled that he "remember[ed] this particular trial well. . . . [T]rial attorney was confronted with the harsh reality that there was overwhelming evidence that the defendant had committed a premeditated murder." The judge explained that at trial there was evidence of motive as well as a number of eyewitnesses. There was no evidence of significant drug or alcohol use prior to the killing and the defendant had no history of mental illness. The judge concluded:

> "Trial counsel, who worked diligently on this case prior to trial and who displayed great skill and preparation during trial, carefully investigated any possible insanity or mental impairment defense. Trial counsel's decision not to pursue a mental capacity defense was well thought out and represented a wise tactical choice. After all, such a defense would have opened the door to the Commonwealth calling two mental health examiners who opined that the defendant was feigning any mental problems. Further, the defendant's own expert's opinion . . . is couched in careful language and might well be considered half-hearted. In addition, the defendant's rendition of a 'blackout' to his expert is contradicted by the defendant's friend who testified at trial. Also, the defendant's expert's conclusions are somewhat premised on the consumption of drugs prior to the killing — a fact not in evidence. Given the weakness

of this defense and the likelihood of a severely damaging rebuttal and cross-examination, most experienced defense counsel would have done what [trial counsel] did: focus the defense on a second degree or manslaughter verdict."[2]

2. *Discussion.* Because the defendant has been convicted of murder in the first degree, we examine his claim that trial counsel furnished him with constitutionally ineffective representation by determining whether there was an error in the course of the trial by defense counsel, and if there was, whether that error created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Bly*, 444 Mass. 640, 648 (2005). We give deference to trial counsel's tactical decisions, and ineffectiveness is not found unless those decisions were "manifestly unreasonable when made." *Commonwealth* v. *Coonan*, 428 Mass. 823, 827 (1999), quoting *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998). Here, as the judge found, trial counsel was faced with overwhelming evidence of his client's guilt. The "basic trouble from the defense standpoint was weaknesses in the facts rather than any inadequacy of counsel." *Commonwealth* v. *Burke*, 414 Mass. 252, 264 (1993), quoting *Commonwealth* v. *Mercado*, 383 Mass. 520, 528 (1981).

Trial counsel's decision to forgo a defense of lack of criminal responsibility was an appropriate tactical decision. "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967), quoting Model Penal Code § 4.01, at 66 (Proposed Official Draft 1962). "[A] defendant will not be convicted of [a] crime if mental illness has deprived him of effective power to make the right choices in governing his own behavior." *Commonwealth* v. *McHoul*, supra at 552, quoting Schwartz, The Model Penal Code, 49 A.B.A. J. 447, 449 (1963). Here, the weaknesses in a defense of lack of criminal responsibility were obvious. Even the opinion of the defendant's own

---

[2]In regard to manslaughter, see discussion *supra.*

expert was, as the judge noted, "couched in careful language and might well be considered half-hearted." The expert concluded that the defendant *may* have experienced a distortion of reality (at the relevant time), and that, due to evidence of his disturbed thought process and self-reports as to drug and alcohol use, the defendant *"most probably"* lacked substantial capacity to conform his conduct to the requirements of the law at the time of the shooting (emphasis supplied). He recognized that the statements of the witnesses to the crime did not support a conclusion of "an active thought disorder or hallucinations immediately preceding the assault." The doctor noted that the defendant "does not present interpersonally" as a paranoid schizophrenic, although he explained that "such individuals are often secretive concerning their thought process." He noted also that the defendant did not have any "documented psychiatric history."

Any value of the expert's opinion was seriously undermined by his reliance on certain facts for which, as the judge found, there was no evidence. His ultimate conclusion, "half-hearted" as it was, was contingent on the fact of the defendant's intoxication: "While it is impossible to know whether the defendant understood the wrongfulness of his actions at the time of the subject offense, there is ample support from the disturbed thought processes implied by his [test scores], by his failure on tests of frontal network functioning, and based on his own legal and personal history of being unable to inhibit and control his drug seeking behavior that the defendant is unable to control his behavior *once he is intoxicated.*" There was no evidence that the defendant was intoxicated at the time of the killing.

Had the defendant introduced this weak evidence in support of a defense of lack of criminal responsibility, the Commonwealth had powerful evidence not only to contradict it, but to establish that the defendant feigned his symptoms of mental instability. Two Bridgewater psychiatrists had concluded within one month of the shooting that the defendant was not suffering from a mental disorder. They each considered that his claimed symptoms of psychosis were "contrived." One year later, a similar opinion was expressed by a Bridgewater clinician, Dr. Krauss. Additionally, the defense expert's opinion was vulner-

able because it relied significantly on the defendant's self-reports of intoxication and blackout at the time of the incident. Both factors could have been rebutted by evidence from the witnesses to the crime and from the defendant's own statement to Pedroza recounting the crime in detail. Given the weakness of the defendant's own expert evidence, together with its likely demolition by the Commonwealth from cross-examination and rebuttal evidence, defense counsel's decision to withdraw the notice of intent to rely on a defense of a lack of criminal responsibility was eminently reasonable.

For the same reasons, it was not ineffective assistance to fail to pursue the defense of lack of criminal responsibility simultaneously with the strategy defense counsel did adopt. It was reasonable to reject completely a strategy that would render the defendant's credibility suspect in favor of one that sought to portray the defendant as sufficiently provoked and confused that he should be convicted only of murder in the second degree.

The defendant also claims that his counsel was ineffective for failing to assert mental impairment to mitigate the charge of murder in the first degree. Massachusetts does not have a "diminished capacity" defense, *Commonwealth* v. *Parker*, 420 Mass. 242, 245 n.3 (1995), but a defendant "may produce expert testimony on the issue whether . . . the impairment of his mental processes precluded him from being able to deliberately premeditate," and whether he acted with extreme atrocity or cruelty. *Commonwealth* v. *Companonio*, 445 Mass. 39, 45 n.7 (2005), quoting *Commonwealth* v. *Gould*, 380 Mass. 672, 673 (1980). The defendant contends that there was "ample evidence available" to present a mental impairment defense to "attack specific intent and premeditation" and to raise "doubt about the defendant's comprehension of extreme cruelty or atrocity." The defendant alleges that Dr. Spiers's diagnosis of frontal lobe deficit syndrome to establish mental impairment would have "given traction" to the defense attempt to achieve a verdict of murder in the second degree, i.e., to combat the evidence of premeditation and extreme atrocity or cruelty.

A decision to proceed with a mental impairment defense based on Dr. Spiers's testimony would face the same hurdles set forth above. The evidence that the defendant was malinger-

ing likely would have damaged the psychologist's testimony and the defendant's credibility. In addition, the doctor's opinion was predicated at least in part on the defendant's intoxication or drug abuse; yet there was no evidence at trial to support the defendant's use of drugs or alcohol immediately before the shooting. Moreover, in the posttrial proceedings, such evidence was contained only in the defendant's own affidavit. The defendant states that, had he known of the availability of a "diminished capacity" defense, he would have testified to his consumption of large amounts of heroin and alcohol "just prior" to the incident. There were considerable risks to having the defendant testify. In addition, such testimony would have been contradicted by witness statements regarding the defendant's purposeful acts at the time: his threat to the victim and her uncle; his execution-style shots to the victim's head; his flight from the scene and apparent disposal of the murder weapon; and his telephone call to Pedroza to bring him cigarettes.

The defendant maintains that it was unreasonable to forgo a mental health defense because it was the defendant's only option. As mentioned, the existence of eyewitnesses and motive evidence left defense counsel few choices. He did seek to obtain a verdict of murder in the second degree (and, ostensibly, of manslaughter, although the judge precluded the jury from convicting the defendant of that offense). To combat the theory of deliberate premeditation, counsel sought to highlight the defendant's argument with the victim immediately prior to the shooting, the defendant's emotional state due to rejection by the victim, and the rapid succession of the two shots he fired. Defense counsel elicited from Pedroza as much evidence of the defendant's drug use as possible. Because Pedroza had not been with the defendant prior to the shooting, he could not testify directly to the defendant's use of drugs before the shooting. Furthermore, it was not unreasonable to contend, as defense counsel did, that evidence of two gunshots in quick succession was insufficient for the jury to consider a verdict based on extreme atrocity or cruelty. He argued as much to the judge, but did not succeed.

We are not confronted here with a case where defense counsel failed to investigate a defense of lack of criminal responsibility

or mental impairment. Cf. *Commonwealth* v. *Walker*, 443 Mass. 213, 223-228 (2005); *Commonwealth* v. *Roberio*, 428 Mass. 278 (1998). Rather, he took appropriate steps to investigate such defenses and, after doing so, made a tactical decision that the defenses were unlikely to succeed. As the judge stated: "Trial counsel did not have particularly good cards in his hand. He made the best of what he had and wisely decided not to make a bad situation worse. [Counsel's] defense certainly did not fall 'measurably below' that of an ordinary skilled criminal defense counsel and his wise tactical decision did not deprive the defendant of a 'substantial' defense."[3]

The defendant also claims that it was error for the judge to deny the motion for a new trial without an evidentiary hearing. A judge has discretion to decide a motion for a new trial without an evidentiary hearing if no substantial issue is raised by the motion or affidavits. *Commonwealth* v. *Shuman*, 445 Mass. 268, 278-279 (2005). See Mass. R. Crim. P. 30 (c) (3), as appearing in 435 Mass. 1501 (2001). We review that decision for any abuse of discretion. That is, the judge's ruling will be affirmed unless "no conscientious judge, acting intelligently, could honestly have taken the view expressed by him." *Commonwealth* v. *Goodreau*, 442 Mass. 341, 348 (2004), quoting *Commonwealth* v. *Ira I.*, 439 Mass. 805, 809 (2003). In deciding whether to grant a hearing, the judge considers the seriousness of the issue asserted as well as the adequacy of the defendant's showing with respect to the issue. See *Commonwealth* v. *Shuman, supra.*

Here, a failure to pursue a defense of lack of criminal responsibility or mental impairment would, if substantiated, raise a serious issue. Thus, the matter turns on whether the material submitted makes an adequate showing concerning that question, i.e., whether the submission "contain[s] sufficient

---

[3]The defendant relies on *Commonwealth* v. *Street*, 388 Mass. 281, 285-288 (1983), and *Commonwealth* v. *Westmoreland*, 388 Mass. 269, 271-275 (1983), to support his claim of ineffective assistance of counsel. In both these cases, however, defense counsel suddenly abandoned a potentially viable defense of lack of criminal responsibility during trial after presenting evidence on the issue. Here, counsel's tactical decision was made prior to trial, and counsel's presentation at trial focused exclusively on theories of defense that he had decided to pursue.

credible information to 'cast doubt on' the issue." *Com-
monwealth* v. *Goodreau, supra* at 348, quoting *Commonwealth*
v. *Britto,* 433 Mass. 596, 608 (2001). Another factor the judge
may consider is whether a hearing will supplement the written
material. If, on the papers presented, the basis of the motion is
not "credible" or "persuasive," an evidentiary hearing ac-
complishes nothing. *Commonwealth* v. *Goodreau, supra* at 348-
349.

The judge deciding the motion here had presided over the
trial and stated that he remembered it well. The issues in the
motion for a new trial were not complex and the material
provided set forth the issues and the facts on which the
defendant relied. There was no abuse of discretion in the
determination that the defendant's motion and supporting
materials did not make an adequate showing to warrant an evi-
dentiary hearing in regard to the claimed ineffective assistance
of counsel.

The defendant's allegation that the judge erred in denying his
motion for funds for a mental health expert is not sufficient to
rise to the level of appellate argument. It consists of a single
sentence that states the claim and a citation. "We do not consider
that to be adequate for appellate consideration." *Commonwealth*
v. *Donahue,* 430 Mass. 710, 714-715 n.1 (2000). We nevertheless
consider the issue pursuant to G. L. c. 278, § 33E.[4] The defendant
did not make an adequate showing that additional funds were
likely to enable him to present a meritorious ground for a new
trial. See Reporters' Notes to Mass. R. Crim. P. 30 (c) (5), Mass.
Ann. Laws, Rules of Criminal Procedure 1589 (LexisNexis 2005).
See also *Commonwealth* v. *Murphy,* 442 Mass. 485, 510 (2004).

Finally, the defendant contends that the evidence was not suf-
ficient to submit the charge of murder in the first degree to the
jury on a theory of extreme atrocity or cruelty. It is unnecessary
to consider this claim. The defendant was convicted in separate

[4]"When a motion for a new trial is denied and is considered by this court
in conjunction with a defendant's direct appeal from a conviction of murder in
the first degree, we review it under the substantial likelihood of a miscarriage
of justice standard required by G. L. c. 278, § 33E." *Commonwealth* v. *Hill,*
432 Mass. 704, 710 n.14 (2000).

verdicts on two different theories (deliberate premeditation and extreme atrocity or cruelty) and does not maintain that the evidence was insufficient on the theory of deliberate premeditation. It is thus a moot issue whether there was sufficient evidence to support a conviction on the theory of extreme atrocity or cruelty. See *Commonwealth* v. *Caputo*, 439 Mass. 153, 168 (2003).

3. *Relief pursuant to G. L. c. 278, § 33E.* We have considered the entire record pursuant to our obligation under G. L. c. 278, § 33E. There is no reason to exercise our authority to reduce the jury's verdict on the murder charge or to order a new trial.

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*