Richard SHUMAN, Petitioner

v.

Luis SPENCER, Respondent.

Civil Action No. 06–11345–RCL.

United States District Court,
D. Massachusetts.

Sept. 25, 2009.

Eva M. Badway, Attorney General's Office, Boston, MA, for Respondent.

Donald A. Harwood, Itkowitz & Harwood, New York, NY, for Petitioner.

## MEMORANDUM OF DECISION

YOUNG, District Judge.

### I. Introduction and Procedural History

Richard Shuman ("Shuman" or "Petitioner") here seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254, seeking relief from his conviction in the Massachusetts state courts. On October 26, 1999, a jury in the Norfolk Superior Court convicted Shuman of two counts of first degree murder. Shuman appealed his conviction to the Supreme Judicial Court of Massachusetts and on November 19, 2002, while his appeal was pending, filed a motion for a new trial with that court. Shuman argued that newly discovered evidence called into question the validity of his conviction; in the alternative, he alleges ineffective assistance of counsel due to trial counsel's failure to investigate potentially exculpatory evidence.

The Supreme Judicial Court remanded the new trial motion to the Superior Court and stayed appellate proceedings. Upon reviewing the affidavits and other supporting materials, the trial judge [1] denied Shuman's motion without holding an evidentiary hearing. Shuman unsuccessfully sought reconsideration; the petition for reconsideration was denied on July 16, 2004. Thereafter, the direct appeal of Shuman's conviction and the denial of his motion for a new trial were consolidated for appellate review. On November 8, 2005, the Supreme Judicial Court affirmed Shuman's convictions and affirmed the denial of his motion for a new trial. *Commonwealth v. Shuman*, 445 Mass. 268, 269, 836 N.E.2d 1085 (2005).

Shuman timely seeks relief in this Court pursuant to 28 U.S.C. § 2254. Shuman alleges that his trial counsel rendered constitutionally ineffective assistance in failing

"to investigate and produce evidence that Petitioner's conduct resulted from a drug-induced state of agitation known as akathisia caused by his injestion [sic] of a prescribed medication, Zoloft." Pet'r's Mot. for Habeas Corpus [Doc. No. 1–1] at 5. Shuman asserts that this failure resulted in the forfeiture of a viable involuntary intoxication defense. Mem. in Supp. of Pet. for Habeas Corpus ("Pet'r's Br.") [Doc. No. 1–2] at 3–4.

### II. Facts

State court determinations of fact are presumed to be correct and petitioner must rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Knight v. Spencer*, 447 F.3d 6, 12 (1st Cir.2006).

#### A. Trial Evidence

On the afternoon of August 5, 1997, Shuman shot and killed two business partners, Jack Badler and Howard Librot. The shootings were attributed to a deteriorating business relationship. Shuman's printing business Foremost Printers ("Foremost") purchased a company named Web Corp. from Librot in 1989. Librot and his wife continued to run Web Corp. under Foremost's ownership. In 1991, Foremost hired Badler to handle the company's finances and accounting. Badler was a friend of Librot. By 1996, Foremost endured a series of poor business decisions and was experiencing serious financial difficulties. Faced with ruinous business prospects, tensions mounted between Shuman, Librot, and Badler. Shuman argued frequently with Badler about his control of the company's accounting. Foremost was unable to pay its financial obligation to either Badler or the Librots. Consequent-

---

**1.** Justice Margot Botsford, who served as the trial judge in this case, is now an associate justice of the Supreme Judicial Court of Massachusetts.

ly, Librot instructed his employees not to permit Shuman on Web Corp. property and not to assist him with any printing.

On August 1, 1997, Foremost's assets were sold. In connection with the sale, Shuman was required to sign a document releasing Badler from any liability related to management of the company's finances. Shuman declined to sign the release. Four days after the sale, Badler processed the payroll for Web Corp., but not for Foremost. Badler refused to process Foremost's payroll until Shuman signed the release. On the morning of August 5, there was a loud argument between Badler and Shuman in Badler's office at Cabot Place in Stoughton. Shuman left, but returned later in the day armed with a nine millimeter Beretta semiautomatic pistol.

Badler called his human resources manager, Helen Anderson, to his office door so that she would observe that Shuman had a gun on his lap. Badler told Anderson to dial 911 if Shuman did not put the weapon away. Shuman told Anderson, "Don't worry. I won't hurt you," and put the gun away. *Shuman,* 445 Mass. at 269, 836 N.E.2d 1085. As Anderson was leaving the room, Shuman told Badler that he had ruined his business and his life. Then he shot Badler in the eye, neck, upper chest, and thumb. As Shuman left Badler's office he told two employees, "Don't worry. I'm not going to shoot you two. I'm not upset with you." *Id.*

Next, Shuman drove to Librot's office which is also located in Stoughton. He entered the office and shot Librot in the head, neck, and chest. Shuman left the building with his weapon in his hand and drove away. Both victims died as a result of their wounds. Minutes after leaving Librot's office, Shuman arrived at his parents' house and told his mother that he had killed two people. Shuman raised a gun to his head and his mother begged

him not to shoot himself. After Shuman put the weapon away, his parents drove him to the police station. *Id.* at 270, 836 N.E.2d 1085.

Evidence was presented during the trial that friends and family began to notice changes in Shuman's personality starting in January of 1997. He was unable to sleep, seemed depressed, lost weight, and on one occasion, held a gun to his head. His regular physician, Dr. Warshaw, prescribed diabetes, cholesterol, and diuretic medication for Shuman. Trial Tr. vol. 10, 236, Oct. 19, 1999. Dr. Warshaw also treated Shuman with a small dosage of an antidepressant known as Elavil (also called amitriptyline). *Id.* at 237. Dr. George Gardos, a psychiatrist, saw Shuman on July 29, 1997, one week before the shootings. Dr. Gardos diagnosed Shuman as suffering from a major depression but did not believe he was a risk of harm to others. Dr. Gardos increased Shuman's preexisting Elavil prescription and also prescribed Zoloft, a "mood elevator." *Shuman,* 445 Mass. at 271, 836 N.E.2d 1085.

Dr. Gardos testified about his examination of Shuman on July 29, 1997, a week before the shootings. On July 29, 1997, Dr. Gardos diagnosed major depression, but did not believe that there was a need for hospitalization, and there were no symptoms of psychosis. Trial Tr. vol. 10, 249–51. At that time, Dr. Gardos doubled Shuman's dosage of Elavil and began Shuman on 50 milligrams of Zoloft a day. *Id.* at 241. Unlike Elavil, Zoloft is a selected serotonin reuptake inhibitor, part of a class of drugs known as "SSRI[s]." *Id.* at 237. Nevertheless, Dr. Gardos testified that he was not actually aware of cases in the literature where Zoloft enhances aggression. *Id.* at 238. In his testimony, Dr. Gardos emphasized the improbability of Zoloft or any other side antidepressant

causing enhanced aggression. *Id.* "These very, very rare paradoxical reactions have been known with all the older antidepressants, including Elavil." *Id.* at 239.

The shootings occurred on August 5, 1997, merely eight days after Dr. Gardos first met with Shuman. That night at the police station, Shuman was examined by Dr. John Daignault, a psychologist of Psychological Services, Inc. and Harvard Medical School. Trial Tr. vol. 11, 76, 83, Oct. 20, 1999. Dr. Daignault testified that when asked how he was feeling, Shuman said he was "very confused . . . his mind was not working right, had not been working right for some time." *Id.* at 83. Dr. Daignault testified that Shuman had not been sleeping well and described feeling paranoid, depressed, and disconnected with reality. *Id.* Dr. Daignault further testified that Shuman seemed "[r]obotic . . . like an automaton. There was no affect, very little affect. He was stiff. His eye contact was poor." *Id.* at 84. Based on his records, Dr. Daignault concluded Shuman had no prior psychiatric history prior to his examination by Dr. Gardos. *Id.* at 85.

After the shootings, psychiatrist and defense expert Dr. Harold Bursztajn, of Harvard Medical School and the Massachusetts Mental Health Center, examined Shuman. Dr. Bursztajn evaluated Shuman for criminal responsibility on September 18, 1998 and October 13, 1998, but never obtained Shuman's full medical record from Bridgewater State Hospital. Trial Tr. vol. 11, 199–201. That record included Shuman's drug treatment. Dr. Bursztajn opined that Shuman suffered from "a major depression, with anxiety which reached psychotic dimensions." *Shuman,* 445 Mass. at 271, 836 N.E.2d 1085. He also testified that Shuman's diabetes exacerbated his depression, and that the antidepressants he had been pre-scribed shortly before the killings magnified its symptoms. Dr. Bursztajn also testified to stressors in Shuman's past, and particular complications for people with diabetes arising from taking the anti-depressant Elavil. He testified that the antihypertensive medication Shuman was taking could amplify depression. Trial Tr. vol. 11, 231–34. In particular, Dr. Bursztajn posited that Elavil in combination with Zoloft can give rise to agitation and compulsive behavior that is irrational but organized. He also testified that these side effects may present "right away," particularly in patients suffering from diabetes. *Shuman,* 445 Mass. at 271, 836 N.E.2d 1085.

Dr. Frederick Kelso, a forensic psychologist, conducted a court ordered competency evaluation of Shuman on August 6, 1997. Trial Tr. vol. 11, 24. Kelso testified at trial that Shuman said "he was sorry, that he wasn't himself, and that he was confused." *Id.* at 33. Dr. Kelso concluded that Shuman was depressed and suicidal but had no obvious indications of hallucinations. He recommended Shuman undergo a full Bridgewater State Hospital evaluation to determine competency to stand trial. *Id.* at 45.

Dr. Paul Nestor of Bridgewater State Hospital also testified. He examined Shuman in August 1997 for an evaluation of competency. Trial Tr. vol. 10, 267. In a report dated September 12, 1997, Dr. Nestor concluded that Shuman was competent to stand trial. *Id.* at 269. Before reaching that conclusion, Dr. Nestor met with Shuman approximately six times and felt that when he initially examined Shuman, he was severely depressed but by the end of the evaluation, Shuman was improving. *Id.* at 271–72. Dr. Nestor also testified that upon intake at Bridgewater, Shuman was taken off the Zoloft. *Id.* at 271.

In rebuttal, the prosecution called Dr. Michael Annunziata, a forensic psychiatrist, who testified that there was no evidence of a marked mood disorder, intellectual impairment, psychotic or delusional disorder, or major depression in Shuman. Trial Tr. Vol. 12, 244–47, 265–66, 307, Oct. 21, 1999. Annunziata's testimony highlighted the lack of evidence of psychosis or delusions found by Drs. Gardos, Daignault, Kelso, and Nestor, in rebutting the defense's trial expert's opinion. *Id.* At trial, Dr. Annunziata was asked whether Zoloft had any warnings about aggression or enhancing aggression, and he responded that "Like many drugs there's a list of hundreds—dozens and hundreds of possible side effects. Almost everything is possible." *Id.* at 330. He conceded that in very few cases, Zoloft causes a high feeling of someone in a depressed state that is "observable." *Id.* at 330–31.

### B. Post-trial Evidence

Akathisia, an induced stage of agitation, was never mentioned during the trial. In the course of the post-trial proceedings, Shuman sought to introduce new evidence about a Zoloft-induced state of agitation called akathisia, including (1) a study published by Dr. David Healy in 2000 linking Zoloft to violent urges in individuals with no history of mental illness; (2) Dr. Joseph Glenmullen's post-trial examination of Shuman and his medical records, wherein Dr. Glenmullen opines that Shuman was in a drug-induced state of akathisia at the time of the shootings; (3) expert testimony from civil litigation involving Pfizer, the manufacturer of Zoloft, linking the product to akathisia; and (4) an United States Food and Drug Administration ("FDA") advisory release from 2004 warning of Zoloft side effects including akathisia, agitation, and impulsivity especially occurring at the beginning of treatment. *Shuman,* 445 Mass. at 271, 836 N.E.2d 1085.

In addition, psychiatrist Dr. Joseph Glenmullen in a post-trial affidavit dated November 5, 2002 described akathisia as a "severe drug-induced agitation" which in some patients who are sensitive, can be caused by SSRIs like Zoloft. Glenmullen Aff. 4, Nov. 5, 2002. Dr. Glenmullen explained akathisia as comprised of an inner subjective agitation, which causes a "state of anxiety, tension, irritability, and impatience, unlike anything the patient has ever experienced before." *Id.* at 4–5. Akathisia also causes an "outer, visible restlessness" and the "abnormal bodily sensations and anxiety can make it difficult for patients to think clearly, leaving them with feelings of confusion and unreality." *Id.* at 5. Dr. Glenmullen explains that akathisia can increase paranoia, trigger panic reactions, and cause suicidal and violent impulses. *Id.* at 6. After reviewing the full record of Bridgewater State Hospital, Dr. Glenmullen concluded that the record indicated Shuman had a "bad reaction" to Zoloft and refused to continue taking it. Although Dr. Glenmullen concedes that Shuman's Bridgewater psychiatrist did not diagnose his agitation as akathisia, he underscores that Shuman was treated with Ativan, a sedating anti-anxiety drug, that has specifically been used to treat SSRI-induced akathisia. Within days of being off Zoloft and being treated with Ativan, "Shuman was described ... as 'less noticeably agitated' and 'no longer feels suicidal.'" Dr. Glenmullen opined that Shuman improved because his akathisia cleared once he was off Zoloft and treated with Ativan. *Id.* at 44–47.

### III. Analysis

#### A. AEDPA Standard of Review under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254

Following the passage of the Antiterrorism and Effective Death Penalty Act

(AEDPA), a state prisoner's application for a writ of habeas corpus may be granted only if the state court's decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States ... or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). In *Williams v. Taylor*, 529 U.S. 362, 407, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court clarified that a state court decision is an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case" or "unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."

## B. The Federal Rule Concerning Ineffective Assistance of Counsel

■ Ineffective assistance of counsel claims are governed by the clearly established federal law derived from *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and its progeny. The petitioner must first show that counsel's performance was deficient. This requires a showing that counsel made errors so serious that they "were outside the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. 2052. Judicial review of counsel's performance is "highly deferential." *Id.* at 689, 104 S.Ct. 2052. In demonstrating deficient performance, the petitioner must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the cir-

cumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (internal citations omitted). Next, the petitioner must show that his defense was prejudiced by the deficient performance. *Id.* at 692, 104 S.Ct. 2052. The element of prejudice requires a demonstration that "the possibility of a different outcome must be substantial" though it does not require that counsel's conduct more likely than not altered the case's outcome. *Ouber v. Guarino*, 293 F.3d 19, 25–26 (1st Cir.2002) (citing *Strickland*, 466 U.S. at 693, 104 S.Ct. 2052).

■ The Supreme Judicial Court applied the Massachusetts ineffective assistance standard. *Shuman*, 445 Mass. at 276, 836 N.E.2d 1085. Under Massachusetts law, a claim of ineffectiveness of counsel in a first degree murder case begins with determining "whether there was a serious failure by trial counsel." *Id.* (quoting *Commonwealth v. Harbin*, 435 Mass. 654, 656, 760 N.E.2d 1216 (2002)). A serious failure by trial counsel is defined as "incompetency, inefficiency, or inattention of counsel—behavior falling measurably below that which might be expected from an ordinary, fallible lawyer." *Id.* (quoting *Commonwealth v. Saferian*, 366 Mass. 89, 96, 315 N.E.2d 878 (1974)). If there is a serious failure by trial counsel, the Court must then determine "whether the failure resulted in a substantial likelihood of a miscarriage of justice." *Harbin*, 435 Mass. 654, 656, 760 N.E.2d 1216. The First Circuit has stated that the Supreme Judicial Court's standard for evaluating ineffective assistance of counsel, as articulated in *Saferian*, is the "functional equivalent of the *Strickland* standard." *Lynch v. Ficco*, 438 F.3d 35, 48 (1st Cir.2006).

## C. The State Court's Application of the Federal Rule

■ Shuman contends that he received ineffective assistance of counsel based on

trial counsel's failure to investigate and produce evidence that petitioner's conduct was caused by akathisia, a state of aggression and agitation, that may have been induced by his ingestion of prescription Zoloft. Kevin Reddington, Shuman's trial counsel, reviewed Dr. Glenmullen's affidavit wherein he set forth clinical evidence that for some persons, Zoloft may cause "suicidal, homicidal and otherwise violent reactions" and Dr. Glenmullen concluded that Shuman was a person affected and poisoned by Zoloft. Reddington Aff. ¶ 6, November 7, 2002. Reddington stated that Dr. Glenmullen was able to review some Bridgewater hospital records, police reports, witness testimony, and interviews when reaching his conclusions. *Id.* He admitted, however, that some of the hospital records he requested prior to the trial were never provided, thus acknowledging that counsel did not obtain Shuman's full relevant medical record for use at trial. *Id.* Reddington also contends that he was not cognizant of the potential connection between Zoloft and aggression or violence.

At the time of Mr. Shuman's trial, I was unaware of the phenomena of Zoloft poisoning and/or the now-established link between Zoloft and violence, including from my then-retained expert, Harold Burstajn [sic]; accordingly, the impact which Zoloft had upon Mr. Shuman's mental state was not raised as a defense at Mr. Shuman's trial. There clearly was no "tactical" nor "strategic" decision made by either myself or Mr. Shuman not to raise such a defense.

*Id.* at ¶ 7.

■■■■ The issue is not merely whether trial counsel should have put on a defense of Zoloft-induced akathisia, but rather "whether the investigation supporting his pursuit of the defense was itself reasonable." *Dugas v. Coplan,* 428 F.3d 317, 328 (1st Cir.2005). Counsel has a duty to make reasonable investigations or to make a reasonable decision that certain investigations are unnecessary. *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* When assessing the reasonableness of an attorney's investigation, "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith,* 539 U.S. 510, 527, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

Rather than concluding there was ineffective assistance by counsel, the Supreme Judicial Court noted that Shuman's trial record reflected "a vigorous, well-prepared, and well-presented insanity defense, with substantial expert and medical testimony to support it." *Shuman,* 445 Mass. at 276, 836 N.E.2d 1085. Moreover, the court found that the Zoloft defense that Shuman argues for is markedly similar to the insanity defense that trial counsel presented. *Id.* at 277, 836 N.E.2d 1085. Counsel argued in his opening that Shuman was a depressed man whose behavior was impacted by his being "up on Zoloft." *Id.*

In denying Shuman's ineffective assistance of counsel claim in Shuman's consolidated direct appeal and appeal of the denial of his motion for a new trial, the Supreme Judicial Court reasoned that the emphasis on an insanity defense rather than presenting a Zoloft defense was a tactical choice by counsel:

In questioning trial counsel's use of the insanity defense, instead of the 'Zoloft defense,' Shuman challenges the tactical approach of his counsel and his principal psychiatric witness ... Shuman essen-

tially asserts that his insanity defense may have been more effective if it had emphasized the alleged toxic effects of Zoloft, rather than the effect of depression worsened by a 'toxic soup' of medication. We do not find the choice of emphasis in a defense to be manifestly unreasonable.

*Shuman,* 445 Mass. at 277, 836 N.E.2d 1085. The Supreme Judicial Court flatly rejected Shuman's claim that the trial counsel's failure to investigate the Zoloft-induced akathisia defense was below an ordinary lawyer's level of competence and distinguished Shuman from other cases in which it has found ineffectiveness of counsel based on an attorney's failure to investigate an insanity defense where relevant facts were known or accessible to the attorney. *Id.* at 278, 836 N.E.2d 1085. "Trial counsel's effective presentation of a well-prepared insanity defense, raising the link between Zoloft and aggression, rather than a pure 'Zoloft defense,' was not a serious failure on his part, nor is any difference between the two sufficient to create a substantial likelihood of a miscarriage of justice." *Id.*

Skilled trial counsel are (and should be) their own harshest critics. Trials are living things and no trial strategy is ever executed quite to the satisfaction of the advocate who devised it. It is well said that "the best cross examination is the one you think of after you sit down." Nor is this the first case where outstanding criminal defense counsel[2] has zealously defended his client to ultimate defeat and has then, in posttrial proceedings, fallen on his own sword.[3]

The pursuit of leads in pre-trial investigation is, like a myriad of other pressures on the busy trial lawyer, a tactical choice, one to which this Court owes a heavy deference. "When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." *Yarborough v. Gentry,* 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003). Had Reddington obtained the full Bridgewater State Hospital record during the run-up to the 1999 trial,[4] he would have learned of a diagnosis—akathisia—to confirm his understanding of how Zoloft could well have heightened Shuman's confusion and suicidal tendencies. But he already could do better than that. His expert, Dr. Bursztajn, was willing to testify (and did) that Shuman's medications, on top of his diabetes and depression, actually rendered him psychotic and unable to conform his actions to the dictates of the law.[5]

What is missing in this record—and this is crucial—is any reliable scientific understanding, *prior* to Shuman's trial, that akathisia could render Shuman violent to others.[6] Reddington admits directly, "At the

---

2. Mr. Reddington is a distinguished Fellow of the American College of Trial Lawyers.

3. *See Dugas,* 428 F.3d at 346 n. 39 (Howard, J., dissenting)("As commonly happens in post-conviction proceedings, [counsel] fell on his sword for his former client.")

4. Although he now complains his request for that record went unfulfilled, there is no argument presented here (or in the courts of the Commonwealth) that prosecutors failed in their duties to make pre-trial discovery.

5. This Court has carefully reviewed the entire trial transcript. Reddington presented Shuman's insanity defense with thoroughness and skill.

6. *See* 19 William G. Young, John R. Pollets, & Christopher Poreda, *Massachusetts Practice Series, Evidence* § 702.3 (2d ed.1998) ("As the Supreme Court explained in [*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)], where 'scientific knowledge' is at issue, ... '[k]nowledge' connotes more than a subjective belief or unsupported speculation, but refers

time of Mr. Shuman's trial, I was unaware of ... the now-established link between Zoloft and violence, including from my then-retained expert, Harold Burstajn [sic]." Reddington Aff. ¶ 7. This is hardly surprising since, as it appears in this record, that link was not reliably understood at the time of the trial. Trial counsel's inability to predict or investigate a potentially more effective variation of a well-prepared insanity defense does not constitute ineffectiveness of counsel. "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough*, 540 U.S. at 8, 124 S.Ct. 1.

Upon the record before it, the Massachusetts Supreme Judicial Court did not misapply the law as explicated by the Supreme Court of the United States.

## IV. Conclusion

For these reasons, Shuman's petition must be, and hereby is, denied.

SO ORDERED.

rather to a body of known facts or a body of ideas accepted as truths on good grounds.'').