# United States Court of Appeals
## For the First Circuit

No. 09-2459

RICHARD SHUMAN,

Petitioner-Appellant,

v.

LUIS SPENCER,SUPERINTENDENT,
MCI-NORFOLK,

Respondent-Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Lynch, Chief Judge,
Howard and Thompson, Circuit Judges.

Donald A. Harwood for Appellant.
Eva M. Badway, Assistant Attorney General, with whom Martha
Coakley, Attorney General, was on brief, for appellee.

February 23, 2011

**THOMPSON**, **Circuit Judge**. In August of 1997, Richard Shuman gunned down two business associates and was later convicted of first degree murder. At trial, Shuman's defense counsel put on a vigorous insanity defense. Advancing a carefully crafted theory that a "toxic soup" of diabetes, depression, and anxiety medications -- including the selective serotonin reuptake inhibitor ("SSRI") Zoloft -- put Shuman in a drug-induced psychotic state at the time of the killings, trial counsel argued that Shuman could not have had the necessary mens rea to commit premeditated murder. A Massachusetts jury rejected Shuman's theory and he was sentenced to life in prison without parole.

After exhausting state remedies, Shuman applied to the federal court for a writ of habeas corpus claiming violations of his constitutional rights under the Sixth and Fourteenth Amendments -- specifically, ineffective assistance of counsel. He now challenges the denial of his habeas petition, again insisting that his trial counsel performed ineffectively by failing to investigate and produce evidence that Shuman's killings resulted, not from a general drug-induced psychosis as was advanced at trial, but rather and more specifically from Zoloft-induced "akathisia," a state of violent urges and agitation.[1] While neither Shuman's trial counsel nor his trial expert, Dr. Harold Bursztajn, referred specifically

---

[1]Akathisia is characterized by muscular agitation, quivering and the inability to sit still, and may appear as a result of prescription drugs. Stedman's Medical Dictionary 42 (28th ed. 2006).

to akathisia, Dr. Bursztajn did testify that Zoloft combined with Shuman's other prescription medicine could give rise to side effects including agitation, a need to act, and "compulsive behavior" that may be "organized" but is nonetheless "delusional." These side effects, he said, manifest "right away" and are exacerbated by diabetes.  For the reasons discussed herein, we affirm the district court's denial of habeas relief.

**I.    Background**

**A.    Facts**

We review the facts largely as described by the Massachusetts Supreme Judicial Court ("SJC") decision affirming Shuman's conviction, "supplemented with other record facts consistent with the SJC's findings."  Yeboah-Sefah v. Ficco, 556 F.3d 53, 62 (1st Cir. 2009) (quoting Healy v. Spencer, 453 F.3d 21, 22 (1st Cir. 2006)) (cert. denied 130 S. Ct. 639 (2009)).

On the afternoon of August 5, 1997, Shuman shot and killed two business associates, Jack Badler and Howard Librot.  The Commonwealth attributed the shootings to a deteriorating business relationship.  In 1989, Shuman's printing business, Foremost Printers ("Foremost"), had purchased another company, Web Corp., from Librot.  Librot and his wife continued to run Web Corp. under Foremost's ownership.  Then, in 1991, Foremost hired Badler, a friend of Librot's, to handle the company's finances and accounting.

In 1994 and 1995, Shuman was on leave from Foremost as

part of a stock buy-out agreement. While Shuman was away, Badler remained in charge of Foremost's finances. The company did not fare so well. By 1996, Foremost had endured a series of poor business decisions which caused it to experience serious financial difficulties. Faced with dimming business prospects, tensions mounted between Shuman, Librot, and Badler. Frequently, Shuman argued with Badler about the company's accounting. By 1997, Foremost was unable to pay Badler's consulting fee for managing its books. Nor was it able to meet its financial obligations to Librot. Soon thereafter, Librot re-purchased Web Corp. from Foremost. Once the sale was complete, Librot instructed his employees not to permit Shuman on Web Corp. property and not to assist him with any printing.

On August 1, 1997, Foremost's assets were sold to another company, Starr Printing ("Starr"). Starr refused to retain Badler to handle the company's books. Consequently, Badler insisted that Shuman sign a document releasing Badler from any liability related to the management of Foremost's finances. Shuman refused. Four days after the sale, Badler processed the payroll for Web Corp., but not for Foremost. Badler refused to process Foremost's payroll until Shuman signed the release. On the morning of August 5, there was a heated argument between Badler and Shuman in Badler's office. Shuman stormed out, but returned later in the day armed with a nine millimeter Beretta semiautomatic pistol.

Confronted by an armed Shuman, Badler had the presence of mind to call Helen Anderson, his human resources manager, to his office door to witness the gun. Badler instructed Anderson to dial 911 if Shuman did not put the weapon away. "Shuman told Anderson, 'Don't worry. I won't hurt you,' and put the gun away." Commonwealth v. Shuman, 836 N.E.2d 1085, 1088 (Mass. 2005). As Anderson was leaving the room, Shuman accused Badler of ruining his business and his life. Then, Shuman opened fire on Badler striking him in the eye, neck, upper chest, and thumb. As Shuman left Badler's office he told two stunned employees, "Don't worry. I'm not going to shoot you two. I'm not upset with you." Id.

After shooting Badler, Shuman drove to Librot's office. He fired as he entered, striking Librot in the head, neck, and chest. With weapon in hand, Shuman left the building and drove away. Both victims died. Minutes after leaving Librot's office, Shuman arrived at his parents' home and told his mother that he had killed two people. Distraught, Shuman raised the gun to his head. His mother begged him not to shoot himself. Eventually, Shuman did put the weapon away and his parents drove him to the police station.

At trial, friends and family testified that beginning in January 1997, they started to notice changes in Shuman's personality. He was unable to sleep, "seemed depressed, lost weight, and on one occasion, held a gun to his head." Id. In fact, in mid-July of 1997, Shuman's family physician, Dr. Warshaw, treated

-5-

Shuman for the first time with a small dosage of an antidepressant known as Elavil.[2] Concerned about the possibility of worsening depression, Dr. Warshaw referred Shuman to a specialist, psychiatrist George Gardos.

Dr. Gardos saw Shuman one week before the shootings. Dr. Gardos diagnosed depression, but discerning no psychosis, saw no need for hospitalization. Furthermore, he did not believe Shuman was a risk of harm to himself or others. Dr. Gardos increased Shuman's preexisting Elavil dosage and prescribed Zoloft, a "mood elevator." Dr. Gardos testified that he was not aware of any "significant or commonly occurring interaction between hypoglycemia, diabetes and Zoloft."

On September 18, 1998 and October 13, 1998, psychiatrist and defense expert Dr. Bursztajn evaluated Shuman for criminal responsibility. Dr. Bursztajn opined that at the time Shuman opened fire, he "was suffering from a major depression, with anxiety which reached psychotic dimensions," as well as paranoia and delusions. According to his testimony, Shuman's diabetes exacerbated his depression, and his consumption of Elavil and Zoloft magnified its symptoms. Dr. Bursztajn also testified about the risk of "amplified depression" arising from the medicine Shuman was taking for hypertension. In particular, Dr. Bursztajn posited that Elavil in combination with Zoloft can give rise to agitation and compulsive

---

[2]Dr. Warshaw's first name does not appear in the record before the court.

behavior which is irrational but organized. He also testified that "the side effects come right away," particularly in patients suffering from diabetes. Dr. Bursztajn's testimony was consistent with Shuman's theory of the case: in defense counsel's opening statement, he described Shuman as an individual "in a state of depression" who had been "crank[ed] . . . up on Zoloft."

The prosecution called as its expert Dr. Michael Annunziata, a forensic psychiatrist. After spending twelve hours with Shuman, Dr. Annunziata testified he observed no evidence of a marked mood disorder, intellectual impairment, psychotic or delusional disorder, or major depression.

In an attempt to lessen the blow of Dr. Annunziata's testimony regarding this lack of evidence, Shuman's counsel, on cross-examination, asked Dr. Annunziata whether the use of Zoloft, in combination with diabetes medication, could cause any side effects, specifically, enhanced aggression. Dr. Annunziata replied that, "[a]ll of the medical [sic] and the combination of medications can cause medical complications. I don't think that you're going to find that the . . . effects result in what you refer to as a fixed delusional system." As a follow-up question, counsel asked Dr. Annunziata whether there are any warnings that Zoloft may cause enhanced aggression. Dr. Annunziata testified that "there's a warning on every drug about almost everything." When asked by defense counsel to specifically address Zoloft, Dr. Annunziata

replied that, "[l]ike many drugs there's a list of hundreds -- dozens and hundreds of possible side effects. Almost everything [sic] is possible." In response to the court's admonishment that "the question is just [in regard to] Zoloft," Dr. Annunziata stated that Zoloft does provide warnings relating to enhanced aggression. He went on to say that in "very, very few cases," Zoloft causes a "high feeling" for someone in a depressed state and can actually "enhance the depression." This enhanced depression would, in Dr. Annunziata's opinion, be "quite observable."

## B.    Procedural History

On October 26, 1999, a state court jury convicted Shuman of two counts of first degree murder. He was sentenced to life in prison without parole. Shuman timely appealed his convictions to the SJC. He also filed a motion for post-conviction relief (i.e., a new trial) on two grounds: (1) newly discovered evidence of a link between Zoloft and violence and, alternatively, (2) ineffective assistance of counsel in failing to establish a link between Zoloft-induced akathisia and Shuman's violent acts. In support of his motion, Shuman submitted an affidavit from a psychiatric expert, Dr. Joseph Glenmullen, who opined that akathisia, a condition not explicitly mentioned during trial, was the cause of Shuman's violent episode. In the affidavit, Dr. Glenmullen asserted that after having reviewed Shuman's full medical record from Bridgewater State Hospital ("Bridgewater"), which trial counsel admittedly never

-8-

obtained, he saw ample evidence of akathisia, though Shuman himself has never suggested the word "akathisia" appears in his medical file from Bridgewater.

On May 10, 2004, upon reviewing the affidavits and supporting materials, the trial justice denied the motion for post-conviction relief without holding an evidentiary hearing. The justice concluded that (1) the evidence was not newly discovered because the link between SSRIs and violence had been public since the early 1990's and (2) Shuman's counsel presented a well-prepared insanity defense in which he specifically, during his cross-examination of the prosecution's expert witness, asked about a link between Zoloft and enhanced aggression.

Shuman filed a motion for reconsideration, which the trial justice denied on July 16, 2004. He appealed the denial of the motion for post-conviction relief, which was consolidated with his direct appeal from his convictions. On November 8, 2005, the SJC affirmed Shuman's convictions and the denial of his motion for post-conviction relief. Shuman, 836 N.E.2d at 1087.

On August 3, 2006, Shuman filed a petition in federal court for a writ of habeas corpus under 28 U.S.C. § 2254. Shuman claimed that he was (1) denied effective assistance of counsel because his trial attorney failed to investigate and present evidence that Shuman's conduct resulted from Zoloft-induced

-9-

akathisia and that (2) this failure resulted in the forfeiture of an involuntary intoxication defense.

On September 25, 2009, the district court denied the petition for habeas relief.[3]  Shuman v. Spencer, 657 F. Supp. 2d 268, 276 (D. Mass. 2009).  Shuman appealed and filed a motion for a certificate of appealability, which the district court granted on October 28, 2009.

## II.  Discussion

### A.  Standard of Review

"We review the district court's denial of habeas relief de novo."  Lynch v. Ficco, 438 F.3d 35, 44 (1st Cir. 2006) (citing Ellsworth v. Warden, 333 F.3d 1, 3 (1st Cir. 2003)).  "Put differently, the district court opinion, while helpful for its

---

[3]We note that in the district court's opinion, which was otherwise well-reasoned and decided correctly, the court plainly misstated the facts when it wrote that the link between Zoloft and violence, "as it appears in this record, . . . was not reliably understood at the time of trial."  Shuman, 657 F. Supp. 2d at 276.  In fact, as the record and the SJC's decision make abundantly clear, Shuman's trial counsel did explicitly make the alleged link between Zoloft and violence.  He did so during opening statement, direct examination of his expert, cross-examination of the state's expert, and closing argument.  The district court may have relied too heavily on trial counsel's post-trial affidavit, filed with Shuman's motion for post-conviction relief, wherein trial counsel surprisingly disclaimed any knowledge at the time of trial of the link between Zoloft and violence, even though both the SJC decision, see Shuman, 836 N.E.2d at 1090-91 & nn. 2-4, and the record belie his claim.  For example, trial counsel said to the court at sidebar, "Remember that guy Phil Hartman? Remember his wife or girlfriend who shot him? They just filed suit against the Zoloft manufacturer because of the enhanced aggression."

reasoning, is entitled to no deference." <u>Healy</u> v. <u>Spencer</u>, 453 F.3d 21, 25 (1st Cir. 2006).

Where the petitioner's claim was adjudicated on the merits by the state court, as it was here, our review of a federal claim for habeas relief is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pursuant to § 2254(d),

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"[C]learly established Federal law" refers to the holdings of the Supreme Court's decisions at the time of the state court decision. <u>Carey</u> v. <u>Musladin</u>, 549 U.S. 70, 74 (2006) (internal quotation marks omitted). When applying § 2254(d)(1) or (2), a decision can still be "reasonable" even if the reviewing court "concludes in its independent judgment that the relevant state court decision applied clearly established federal law <u>erroneously</u> <u>or</u> <u>incorrectly</u>." <u>Renico</u> v. <u>Lett</u>, 130 S. Ct. 1855, 1862 (2010) (internal quotation marks omitted and emphasis added). "[U]nreasonable" under this section of the AEDPA means something

-11-

greater than incorrect or erroneous.  See id.  Finally, even if a state court's error rises to the level of being "unreasonable," habeas relief remains unavailable unless the petitioner can also show that the error "had a 'substantial and injurious effect or influence in determining the jury's verdict.'"  Delaney v. Bartee, 522 F.3d 100, 105 (1st Cir. 2008) (quoting Brecht v. Abrahamson, 507 U.S. 619, 631 (1993)).

The clearly established federal law relating to ineffective assistance of counsel claims is based on Strickland v. Washington, 466 U.S. 668 (1984).  Strickland established that the Sixth and Fourteenth Amendments to the United States Constitution entitle a defendant "to the effective assistance of counsel in all state criminal prosecutions which may result in the loss of his liberty." Yeboah-Sefah, 556 F.3d at 70 (citing Strickland, 166 U.S. at 684).  Of course, "to establish constitutionally ineffective assistance of counsel as a ground for federal habeas relief, the petitioner bears a doubly heavy burden."  Id.  On direct appeal, to demonstrate ineffective assistance under Strickland, Shuman must show: "'(1) deficient performance by counsel (2) resulting in prejudice.'"  Id. (quoting Malone v. Clarke, 536 F.3d 54, 63 (1st Cir. 2008)).  In this context, "deficient" does not mean merely lacking or wanting; it "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466

-12-

U.S. at 687. Likewise, prejudice cannot be proved by any small quantum; it "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id.

But even this exacting demonstration is not enough in a habeas proceeding. Under AEDPA, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard," which is the question we would ask if the claim came to us "on direct review of a criminal conviction in a United States district court." Harrington v. Richter, 131 S. Ct. 770, 785 (2011). In addition, AEDPA sets out a separate and demanding standard applicable to review of a state court's factual findings. Pike v. Guarino, 492 F.3d 61, 68 (1st Cir. 2007). The state court's factual findings are "presumed to be correct" unless the petitioner can rebut this "presumption of correctness" with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

An ineffective assistance of counsel claim, we have said, is a mixed question of law and fact and should therefore be reviewed under the "unreasonable application" clause of § 2254(d)(1). Yeboah-Sefah, 556 F.3d at 70. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied

Strickland's deferential standard." Harrington, 131 S. Ct. at 788. We find that there is.

### B.    Ineffective Assistance of Counsel

Shuman first insists that trial counsel's failure to fully investigate and present the link between his ingestion of Zoloft and the drug's immediate side effects, specifically akathisia and enhanced aggression, rises to the level of constitutional deficiency.  In support of this assertion, Shuman relies on decisions from our sister circuits that discuss trial counsel ineffectiveness in failing to adequately present a defense -- each of which is easily distinguishable from the case before us.  See, e.g., Washington v. Murray, 952 F.2d 1472, 1476-79 (4th Cir. 1991) (claims by petitioner that trial counsel was ineffective in failing to develop and present to jury the results of exculpatory laboratory tests on semen stains found on blanket recovered from bed where rape of victim allegedly occurred entitled petitioner to evidentiary hearing); Grooms v. Solem, 923 F.2d 88, 90 (8th Cir. 1991) ("Once a defendant identifies potential alibi witnesses, it is unreasonable not to make some effort to contact them to ascertain whether their testimony would aid the defense."); Harris v. Reed, 894 F.2d 871, 877-79 (7th Cir. 1990) (defendant's attorney's failure to call eyewitnesses who saw another man run from scene of shooting constituted ineffective assistance of counsel).

None of the cases cited above, on which Shuman so heavily relies, casts doubt on the reasonableness of the SJC's decision that trial counsel was not ineffective.  Washington, Grooms, and Harris are on their facts entirely inapposite.  None dealt with a defense actually presented but not highlighted as being a separate defense.

Shuman also contends that trial counsel's admitted failure to obtain his complete medical file from Bridgewater, where Shuman was treated after the killings, rises to the level of constitutional deficiency.  While we in no way condone this apparent oversight, we note that even if trial counsel had obtained the complete file, no one at Bridgewater ever diagnosed Shuman with akathisia.  Thus, it would be highly speculative to assume that the file would somehow have led counsel to put on a pure Zoloft-induced akathisia defense which Shuman now prefers.

In finding that trial counsel's performance was not deficient the SJC said,

> The Zoloft defense that Shuman now offers, and the insanity defense that trial counsel presented, are very close indeed; both aver that drugs, in combination with Shuman's preexisting depression, contributed to his aggressive behavior. Trial counsel argued in his opening statement that the defendant was "crank[ed] ... up on Zoloft" by his doctor, and was a man "in a state of depression, with his medical condition, on Zoloft," who had been driven to the psychotic state that resulted in his pulling the trigger. Counsel also repeatedly argued in his

-15-

> closing that Shuman was affected by a "toxic soup" of medication, and had been "jack[ed]" up on "meds," including Zoloft. Application of the term "akathisia" to the behavior rather than "heightened aggression" is of little consequence.

Id. at 1093. The SJC reasonably reached the conclusion that trial counsel's performance was not deficient and, therefore, only summarily addressed the second prong under Strickland, that Shuman was not prejudiced by any difference between the two defenses. See id. On habeas review, Shuman has the daunting task of showing that the SJC was unreasonable in rejecting the Strickland claim. He has failed to make that showing.

Nor do we find any basis to conclude that the SJC's ineffective assistance of counsel analysis was based on an unreasonable determination of the facts in light of the evidence presented at trial. See 28 U.S.C. § 2254(d)(2). The SJC found that trial counsel in fact linked Zoloft to enhanced aggression in his opening statement, on cross-examination, and in his closing argument. Shuman has not succeeded in rebutting these presumptively correct findings. Because the SJC's findings reflect a reasonable reading of the record, we must uphold its analysis of the Strickland claim based on those facts. Id.

## III. Conclusion

Nothing before this court leads us to conclude that the SJC was unreasonable in its application of Strickland. As a result,

-16-

we affirm the district court's holding denying Shuman habeas relief.